## GULF, C. & S. F. RY. CO. et al. v. HINES et al. (No. 11853.)

Court of Civil Appeals of Texas. Fort Worth. Dec. 10, 1927.

Rehearing Granted Feb. 11, 1928.

**1. Carriers ⬳211—Terminal railroad receiving live stock from another railroad for delivery is "connecting carrier" within meaning of federal 28-hour law.**

A terminal railroad company which receives cars of live stock from other railroad companies for transportation and delivery to another company or to stockyards is a "connecting carrier," whose road forms a part of the line of road over which shipment is made, within meaning of federal 28-hour law, and is subject to its provisions as to interstate shipments.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Connecting Carrier.]

**2. Evidence ⬳20(2)—Court of Civil Appeals could judicially notice that railway was extensive system.**

Court of Civil Appeals could take judicial cognizance of fact that the Texas & Pacific Railway was extensive system, extending in Texas from Texarkana to El Paso.

**3. Carriers ⬳224—That railroad with extensive system acted but for short distance in switching cars of live stock did not destroy its "common carrier" character, so as to prevent suit in any county where connecting carrier did business (Rev. St. 1925, art. 905, and art. 1995, § 24; Const. art. 10, § 2).**

That railroad with extensive system hauled live stock but a short distance in switching cars transferred to it by connecting carrier did not destroy its character as "common carrier," within meaning of Rev. St. 1925, art. 905, and Const. art. 10, § 2, so as to prevent its being sued pursuant to Rev. St. 1925, art. 1995, § 24,

---

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

in a county other than its domicile and where its connecting carrier did business; "common carrier being one who, by virtue of his business or calling, undertakes, for compensation, to transport personal property from one place to another by land or water, and delivers same for all as may choose to employ him (citing Words and Phrases, Second Series, "Common Carrier").

**4. Carriers ☜228(5)—Findings that connecting carrier's delay in delivering live stock constituted negligence and caused injury to shipment held sustained by evidence.**

Findings that connecting carrier's delay in delivery of live stock transferred to it was negligence and constituted proximate cause of injury to shipment *held* sustained by evidence.

**5. Evidence ☜525—Witness showing acquaintance with selling price of jacks could testify thereto, though there was no fixed "market value."**

A witness showing his acquaintance with the selling price of jacks could properly testify as to such value, even though there was no fixed or definite market price for them as for cattle and hogs; "market value" being such sum of money as property is worth in the market generally to persons who would pay the just and full value for what the property would bring at a fair sale where one party wants to sell and the other to buy (citing 3 Words and Phrases, "Market Value").

**6. Trial ☜277—Objections to charges should not be couched in veiled terms.**

Objections to charges should not be couched in veiled terms so as to hide rather than express the real objection.

On Appellants' Motion for Rehearing.

**7. Appeal and error ☜216(1)—Objections sufficiently specifying error will preserve point on appeal without necessity of directing court's attention thereto by special charge (Rev. St. 1925, arts. 2185, 2190).**

Under Rev. St. 1925, arts. 2185, 2190 (Rev. St. 1911, arts. 1971, 1985), objections which sufficiently specify the error will preserve the point on appeal without the necessity of again directing the court's attention to the subject by special charge.

**8. Trial ☜366—Objection to submission of issue of what was reasonable cash market value because issue of there being a market value was not submitted held sufficient objection that issue was charge on weight of evidence.**

In action for damages for death of live stock as result of carrier's negligence, objection to the submission of issue of what was the reasonable cash market value, on the ground that no issue of there being any market value had been submitted, *held* a sufficient objection that issue was a charge on weight of evidence.

**9. Carriers ☜228(1)—Plaintiffs suing to recover market value of jacks dying because of carrier's negligence had burden of showing market value.**

Plaintiffs suing carrier for damages for market value of jacks dying as result of exposure in transportation had burden of showing market value.

Appeal from District Court, Johnson County; Irwin T. Ward, Judge.

Action by Tom W. Hines and another against the Gulf, Colorado & Santa Fé Railway Company, in which said defendant impleaded the Texas & Pacific Railway Company. Judgment for plaintiffs against the original defendant, and for the original defendant against the impleaded defendant, and both defendants appeals. Reversed and remanded.

Thompson & Barwise and Lee, Lomax & Wren, all of Fort Worth, T. D. Gresham, of Dallas, and J. O. Lockett and Heber Henry, both of Cleburne, for appellants.

J. D. Kugle, of Dallas, and O. O. Chrisman, of Cleburne, for appellees.

BUCK, J.   Tom W. Hines and son, Ben J. Hines, sued the Gulf, Colorado & Santa Fé Railway Company, hereinafter called Santa Fé Railway, for damages, alleging that on October 9, 1925, they shipped from Venus, Johnson county, a carload of live stock, consisting of 8 jacks, 7 jennets, 4 mules, and 1 mare, destination Dallas, to be unloaded at the Fair Grounds; that the car upon reaching Dallas was negligently placed upon a side track and left standing there from about 3 o'clock in the afternoon of October 9th until 9:30 p. m. of the same day; that it was raining and the weather was cold, and the live stock became chilled; and that three of the jacks contracted pneumonia and two of them died two days thereafter. Plaintiffs alleged that the reasonable cash market value of the said jacks was $750 each. He sued for $1,500 damages.

The defendant Santa Fé Railway impleaded the Texas & Pacific Railway Company, hereinafter called T. & P. Railway, alleging that if the original defendant were liable by reason of the allegations in plaintiffs' petition that it had a right to recover against the T. & P. Railway for any judgment that should be recovered against the Santa Fé Railway. The T. & P. Railway interposed its plea of privilege to be sued in Dallas county, alleging that the district court of Johnson county had no jurisdiction over it in this cause, because it was not at the institution of the suit nor at the time of the trial, nor at the time service was had upon it, a resident of Johnson county, but that it was a resident of Dallas county, where it is domiciled and has its principal place of business. The court overruled the plea of privilege.

A trial was had on November 9, 1926, and the cause was submitted to a jury upon special issues, which, with the answers thereto, are hereinafter set out:

"(1) Was the car of live stock belonging to the plaintiff delivered at its destination at the Fair Grounds at Dallas, Tex., with reasonable diligence and dispatch? Answer: No.

"(2) Did the failure to deliver said stock at the Fair Grounds with reasonable diligence and dispatch constitute negligence, as hereinafter defined? Answer: Yes.

"(3) Was such negligence on the part of the defendant Gulf, Colorado & Santa Fé Railway Company, its agents, and employees, the proximate cause of the death of the two jacks, the value of which is sued for in this case? Answer: Yes.

"(4) Did the failure to deliver said stock at the Fair Grounds with reasonable diligence and dispatch also constitute negligence on the part of the Texas & Pacific Railway Company, acting in this instance as the agent of the defendant Gulf, Colorado & Santa Fé Railway Company? Answer: Yes.

"(5) Was such negligence on the part of the Texas & Pacific Railway Company the proximate and sole cause of the death of the two jacks, the value of which is sued for in this case? Answer: Yes.

"(6) What was the reasonable cash market value of the two jacks at the time of their death? Answer: $1,400."

Special issue requested by the defendant Texas & Pacific Railway Company:

"Was the damage, if any, sustained by the shipment in question caused by the inherent vice of the animals which died of pneumonia? Answer: No."

Upon the answers of the jury, the court entered judgment for plaintiffs against the Santa Fé Railway for $1,400, and interest, and gave judgment for the Santa Fé Railway over against the T. & P. Railway for a like amount. From this judgment both railway companies have appealed.

### Opinion.

We will first dispose of the T. & P. Railway's plea of privilege. The contention is made that in the service performed by the T. & P. Railway it was but a switching agent, and was not a connecting carrier, or a common carrier; that the Santa Fé Railway, inasmuch as it had no tracks out to the Fair Grounds, hired the T. & P. Railway as its agent to secure the delivery of the car of live stock to the Fair Grounds; that the T. & P. Railway received the shipment at the transfer track and shipped it to a point within the city of Dallas. Article 10, § 2, of the state Constitution, provides:

"Railroads heretofore constructed or which may hereafter be constructed in this state are hereby declared public highways, and railroad companies, common carriers."

"A 'common carrier' is one who, by virtue of his business or calling, undertakes for compensation to transport personal property from one place to another, either by land or water, and deliver the same, for all such as may choose to employ him; and every one who undertakes to carry and deliver for compensation the goods of all persons indifferently is, as to liability, to be deemed a 'common carrier.' United States v. Ramsey, 116 C. C. A. 568, 197 F. 144, 146"—cited in Words and Phrases, Second Series, 801.

[1] A terminal railroad company, which receives cars of live stock from other railroad companies for transportation and delivery to another company or to stockyards, is a "connecting carrier," whose road forms a part of the line of road over which the shipment is made, within the meaning of the 28-hour law,, and is subject to its provisions as to interstate shipments. United States v. Northern Pac. Terminal Co. (C. C.) 181 F. 879.

Article 905, Rev. Civ. Statutes of 1925, defines "connecting lines" and is in part as follows:

"All common carriers in this state over whose transportation lines, or parts thereof, is transported any freight, baggage or other property received by either of such carriers for shipment or transportation between points in this state, on a contract for carriage recognized, acquiesced in, or acted upon by such carriers shall, with respect to the undertaking and matter of such transportation be considered and construed to be connecting lines. Such lines shall be deemed and held to be agents of each other, each the agent of the others, and all the others the agents of each, and shall be deemed and held to be under a contract with each other and with the shipper, owner and consignee of such property for the safe and speedy transportation of such property from point of shipment to destination; and such contract as to the shipper, owner and consignee of such property shall be deemed and held to be the contract of each of such common carriers. The provisions of this law shall apply whether the route of such freight, baggage or other property be chosen by the owner or his agents, or by the initial carrier to whom such property is delivered."

In T. & P. Ry. Co. v. Henson, 103 Tex. 598, 132 S. W. 118, opinion by Chief Justice Gaines, it was held that the Fort Worth Belt Railway Company, delivering cattle to the stockyards shipped over the T. & P. Railway from Midland county to Fort Worth, was properly sued in Midland county. Article 1995, § 24, Rev. Civ. Statutes of 1925, provides that:

"Suits arising from damage or loss to any passenger, freight, baggage or other property, by reason of its transportation, or contract in relation thereto, in whole or in part by one or more common carriers or the assignees, lessees, trustees or receivers thereof, operating or doing business as such in this state, or having agents or representatives in this state, may be brought against one or more of those so doing business, in any county where either does business or has an agent or representative."

In the Henson Case the Supreme Court said it might be doubtful whether the Fort Worth Belt Railway was a railroad company in the broad sense of this term, or a common carrier, but the evidence showed that it was a transportation company, and that its sole

business was to intercept cattle on the way to the stockyards north of Fort Worth and to transport them over its own line to the stockyards; that at least the Fort Worth Belt Railway was a transportation company, and included in the purport of the act defining the venue of suits against railway companies and others.

In Kansas City So. Ry. Co. v. Rosebrook-Josey Grain Co., 114 S. W. 436, by the Texarkana Court of Civil Appeals, the controversy was over some cars of grain, which, after being loaded and on the switch track of the Texarkana & Ft. Smith Railway, were destroyed by fire. The railway company named was to perform only a switching service in delivering the cars to other carriers who were to transport the cars, under ordinary bills of lading, to destination. The appeal was by the switching carrier, who was held liable for the value of the grain destroyed. For the switching service the appellant was paid according to certain agreed and fixed charges, not by the owner of the grain, but by the carrier receiving the car for transportation to destination, as in the instant case. The court held that the railway company in performing the switching service was a common carrier. In part, the court said:

" 'The distance over which freight is hauled, * * * whether in its own cars or those belonging to connecting carriers, can make no difference with the capacity in which the company acts. A railroad transporting a passenger or a car load of freight one mile, using a switch engine for motive power, is just as much a common carrier as if the distance were a thousand miles by regular freight or passenger train. The fact that compensation for this particular service was paid by the St. Louis & San Francisco Railway Company, while it might render that company also responsible, could not relieve the defendant company from its liability as a carrier. The defendant company was bound to receive and transport this merchandise as a common carrier, and there is nothing in the facts of the case showing that it did receive it in any other capacity.' It appears to us that the reasoning employed in the foregoing opinion is peculiarly applicable to the facts in this case and announces a correct proposition of law. If a railway company is per se a common carrier, we are unable to understand how it can disrobe itself of that character when it undertakes for hire to transport freight any distance. This is the very service for which it was given the character of a common carrier, and it was intended by the law to make this peculiar characteristic follow it in all of its legitimate operation."

In Nation v. S. A. So. Ry. Co., 115 Tex. 431, 283 S. W. 157, by Section B of the Commission of Appeals, the action was brought by Nation in Denton county against the appellee named, to recover damages to live stock while in transit. The railway company filed an answer that if any damage occurred to the cattle it was due to the negligence of the Houston & Texas Central Railway Company,

and upon prayer for judgment over against it, the latter company was cited and brought in as a party defendant, and thereupon judgment against the Houston & Texas Central Railway was also sought by plaintiff. The shipment had moved, in part, over the line of the Gulf, Colorado & Santa Fé Railway Company, which was not sued, for the reason that such company did not cause any of the damages sued for. None of the railway companies named operated a line of railway, or had any agent in Denton county, except the Gulf, Colorado & Santa Fé Railway Company. The trial court sustained a plea of privilege filed by the Houston & Texas Central Railway, and upon appeal to this court, we certified the question to the Supreme Court. The Commission of Appeals held that the plea of privilege should not have been sustained. The holding in Kansas City So. Ry. Co. v. Rosebrook-Josey Grain Co., supra, has been cited a number of times with approval; in Elder, Dempster & Co. v. St. L. S. W. Ry. Co., 105 Tex. 628, 154 S. W. 975; West v. Whitehead (Tex. Civ. App.) 238 S. W. 976, writ of error refused, and many other cases. In the last cited case it is said:

"As we have said, the status of a railroad, as such, is not determined by its length; whether it is a mile long, or a thousand miles long, it is a railroad nevertheless"—citing cases.

[2, 3] We think we can take judicial cognizance of the fact that the T. & P. Railway is an extensive system, extending in Texas from Texarkana on the east to El Paso on the west. It is undoubtedly a common carrier, and the service it rendered in the instant case did not destroy its character as a common carrier. Therefore we overrule the assignments of the T. & P. Railway directed to the action of the court in overruling its plea of privilege.

Under assignments 4, 5, and 6, the contention is made that plaintiffs' pleadings allege that the damage occurred at a particular place and time in the course of the shipment, and that the evidence undisputedly showed that the damage complained of might have been incurred at any time after the shipment left the barns of the plaintiffs, and before the same were delivered at the Fair Grounds in Dallas. It is true that the plaintiffs alleged that the injury occurred after the car containing the live stock arrived at Dallas, and was placed upon a side track near the Fair Grounds. It was alleged that the car arrived in Dallas "at or about 3 o'clock p. m." on October 9, 1925. Henry Gorske testified:

That he was the caretaker accompanying the shipment. That the train left Venus between 9 and 10 o'clock a. m., and arrived in Dallas between 1 and 2 o'clock p. m. That it was cold that morning, but not very cold. That there had been no rainfall at Venus before the shipment left, though they passed through some rain en route, about Midlothian. That when the shipment reached Dallas he examined the con-

dition of the stock and found it "pretty good." He stated they were not suffering. "It was not much cold at that time. As to whether I have had a lot of experience in handling jacks and stock, I didn't handle jacks, but I handled stock. I was raised on a farm. As to whether or not those jacks were in good condition when we arrived there, they were not suffering from the cold or anything like that. They were pert and holding their heads up. They did not show any signs of being chilled or of being cold. As to whether I noticed any change in their condition during the evening, about 3 o'clock or after they began to get cold. At that time there was a slow rain falling, and it was getting colder all the time. I sat out there with the stock, on the box car, for a while, and then I went up to that tower because it was too cold out there. I was so cold out there that I could not stay out there. That day was about the same as it was here yesterday as to being cold, but it was also rainy that day. That was about the first norther of the year, last year in October, and just about this time of the year. They had a fire up there in the tower, and I had to sit around the fire most of the evening. That stock began to get cold along about 3 or 4 o'clock in the evening. From that time on up until the time I was set out there at the Fair Grounds between 9 and 10 o'clock this stock kept getting cold and chilled. I know that because I would go down there where they were in the car every once in a while and see how they were. They were shivering and pawing and trying to get out. They were still there in the car. There was a mist rain falling that evening, and the wind was out of the north. That was an open slatted stock car these stock were in. It wasn't much cold during my trip to Dallas with the stock. It was cold, but it wasn't very cold. It got colder along in the afternoon. As to the condition of the stock when I unloaded them between 9 and 10 o'clock that night, when we took them out of the car, they were pretty cold, and they looked to me like they were shivering."

Dr. A. C. Burns, a veterinary, testified that he examined the stock at Venus in the afternoon of October 8th, and in the morning of October 9th, and he found the condition of the stock to be good; that they were in a good healthy condition; that one can judge the condition of a jack by the way he holds his head, and his alertness.

Tom W. Hines, one of the plaintiffs, testified that he personally inspected the car of jacks before they left Venus the morning of the 9th, and that if he had seen anything the matter with them he would not have shipped them; that he did not see any jacks that looked droopy or in any condition that indicated that they were not in A-1 order for show purposes.

Dr. Burns further testified as follows:

"As to what produces pneumonia in stock, there are predisposing factors, possibly several; an animal becoming too hot and then chilling, or a chill itself, and at times we have possibly a pneumonia following other infectious diseases, such as shipping fever, due to complications. If caused from exposure, an animal is very much like a human in a disease of that kind. The same condition that would give an individual an awful cold and from that run into pneumonia will do that in an animal. A jack is more susceptible to cold than the average animal. Where he is housed and taken care of he is more susceptible than the average animal. * * * You ask me to suppose that these animals, which I examined and found in good condition when they left Venus, arrived in Dallas at 2 o'clock, in good condition when they arrived there, and stood in an open car there from 2 o'clock until 9:30 that night, with a slow rain falling a large portion of the evening and with the temperature down about like it was yesterday, around 43, standing there in that car, and that when they were unloaded from that car they were chilled and couldn't hardly keep quiet, and then were taken into the barns, and two days later died from pneumonia—asking me also what in my judgment and opinion was the cause of the death of those mules. I should judge the predisposing factor was a chill. I would say that it is possible that the 6½ hours of exposure there produced the pneumonia from which they died, and it is probable. Assuming that these animals arrived at that time, at 2 o'clock, and that they were in good condition, suffering from no cold or exposure, and that they stood there 6½ hours on those tracks, and when they were unloaded they were chilled and cold and shivering, and that two days later they died from pneumonia, in my judgment and opinion it is possible that they died from such exposure. If the pneumonia was caused from exposure and they had no other exposure, that would have apparently been the cause of their death."

On cross-examination by counsel for the Santa Fé Railway, Dr. Burns further testified:

"As to whether pneumonia prevented those jacks from being entered there at that time in the fair, and whether or not that was one of the diseases that I was called on to test for, I examined them for any condition that would make them unfit for showing. Glanders is the main test required, but they require an examination as to whether the animals are in good health at the time they are examined. The test for good health included pneumonia, and it included everything other than blemishes. In this instance, I did not make a test for pneumonia. There is no test for pneumonia, other than the physical condition of the animals. As to whether pneumonia is the character of disease where the germ can be carried in the system for some time and then if the vitality is lowered the germ goes to work and the disease results, lots of times that is the case. If you lower the vitality of the animal possibly you can have pneumonia from an infection. The general accepted theory about tuberculosis in animals as well as in people is that practically everybody in normal health carry the germ, but it doesn't work on them until something lowers their vitality, and then the germ gets to work. That is the general conception of tuberculosis, that every human harbors tubercular organisms, and when resistance is lowered possibly it will offer a better opportunity for the disease to take hold. The same thing is possibly true with reference to the pneumonia germ. * * *

"This shipment moved from Venus to Dallas, I judge, in a stock car; however, I couldn't describe the car. Assuming this shipment left Venus for Dallas anywhere between 7:30 o'clock and 10 o'clock and arrived in Dallas about 1 o'clock, and that during that period a norther was blowing and it was raining, it could have been possible for that congestion to have developed with that norther blowing on the animals even before the shipment got to Dallas. And that congestion might have developed into pneumonia before they got to Dallas. I am not in a position to say that the pneumonia that these mules died of was contracted between 3 o'clock in the afternoon and 9 o'clock at night on October 9th. I don't know about that. As to how long after mules have started with congestion of the lungs or have this infection until they develop into pneumonia, we consider congestion is usually the first stage of pneumonia, and then it goes into the real stage of pneumonia, the stage of red hepitization, where the lung becomes filled and is liver-like in character. As to how long it takes to do that, it varies, of course; possibly 24 to 36 hours, or something of that kind. If one of these jacks died within two days after arriving in Dallas and had pneumonia for a period before it died, this congestion could have developed, the beginning of it, even back as far as Venus. As to whether I would say it did or didn't from my knowledge of the case, I would say this, that I don't think there were any symptoms of congestion or pneumonia symptoms when I made my final examination of the animals at Venus. I was not examining them particularly for a slight congeston of the lungs. That would have been something I would have discovered if it had been sufficiently noticeable at the time I examined them. As to what effect it would have on mules standing in open pen from 3 o'clock in the afternoon until some time after 7 o'clock the next morning, and as to whether there was a chance that they might get chilled somewhat standing there in the open pens at Venus, that would depend upon the weather conditions and such as that. If there was a lowering of the temperature running down from 61 degrees, and a slight mist, there would be a possible chance; more so where the animals had been previously housed, possibly, than otherwise."

Dr. A. E. Flowers, of Dallas, testified:

"Assuming that this stock had been taken from the barns at the farm on the evening of the 8th and brought to Venus, the temperature at that time ranging from 70 to 75 degrees, and stood in open pens during the night and about 3 o'clock next morning they were loaded in the car before there was any rain, before they became wet, and they stood in the open stock car from that time up until about 8 o'clock that night, all through the day, that the temperature from about 8 o'clock in the morning began to lower up until say about 12 to about 60 degrees, and then from 60 degrees went down to 43 or 44 degrees at 8 o'clock that night, as to what part of that exposure I would say would be most severe upon this stock, and most likely to produce the lung trouble from which they died, I would say the longer they were exposed to that falling temperature the more apt they would be to have

trouble. If this stock had been housed entirely open and went to the pens at 8 o'clock in the evening, with a falling temperature from 8 o'clock in the morning, that would have a tendency to produce trouble, and it might be considered an exposure, and I would consider it exposure, if they were housed until that time of night and taken up there and left standing in the open with a falling temperature. It is true with reference to live stock, as it is with human beings, that they will stand a certain amount of exposure without any bad effects, if subjected to a continued exposure, that the longer they are subjected to that exposure, that the more apt they are to contract the trouble from which these stock died.

"Saying that the temperature from the time the stock was driven to the pens, at 8 o'clock, up until 12 o'clock the next day ranged from around 60 degrees, and then from 12 o'clock on until 8 o'clock that night, that it ranged downward to 43 or 44 degrees, with the stock exposed all during that time, as to what part of that exposure would in my judgment and opinion, probably produce the condition that I found in this stock, I will say that animals exposed for a short length of time might withstand a certain amount of exposure; but the longer they are exposed the more the animal is debilitated, especially if they had not been eating and drinking well, they would naturally become more susceptible to the elements."

On cross-examination Dr. Flowers further testified:

"I would not attempt to say at what point in this exposure this condition was caused, except that the longer an animal is exposed the more apt it is to have trouble. I would not say whether it was contracted down at the depot at Venus or not."

[4] We think the evidence cited and other evidence in the record supports the finding of the jury that the failure to deliver said stock at the Fair Grounds with reasonable diligence and dispatch constituted negligence on the part of the T. & P. Railway, and that such negligence was the proximate and sole cause of the death of the two jacks, for which suit was brought. The evidence shows that Mr. Gorske, through the man in charge of the tower, and Mr. Tom and Ben Hines through the railway officials and superintendent of the live stock department of the Texas State Fair, telephoned a number of times during the afternoon and early part of the night, urging that the car be delivered promptly, and stating that they were suffering from the cold and rainy weather. There appears no good reason why the delivery of the car was delayed from the time it was placed on the siding of the T. & P. Railway to the time when they were actually delivered, about 9:30 or 10 o'clock. The evidence shows that the car was standing on the T. & P. Railway track about one-half or three-fourths of a mile from the Fair Grounds during these some 6 or 7 hours, and we believe that the jury were justified in finding that such delay was negligence.

Complaint is also made that the evidence of market value of the jacks were not shown. Mr. Tom W. Hines testified:

"I am acquainted with the reasonable cash market value of such type jacks as I lost over there—as these two jacks that died. As to what was the reasonable cash market value of those two jacks I lost there at the Fair at that time, I know how I valued them. I know the cash market value of jacks at that time. If those jacks would have sold at all, they would have brought between seven and nine hundred dollars. I had sold some jacks from those before that, similar to these jacks, and I had gotten prices in keeping with that. There is no fixed price for jacks like there are for cattle and hogs. You can't take them to a stockyard and sell them like other stock. It depends on the demand for them. It depends on whether a man wants them and whether he wants that kind or class of an animal. And it depends on a man's appreciation for good animals. The jacks I sold were of this same class of jacks. As to whether these jacks that died were as good jacks as the ones I sold, a man always thinks he keeps the best. I try, if I can, and if I have to have any left, I try to keep the best ones. The whole herd of jacks had the same sire. I know the different prices I have received for jacks from year to year. Of course, that depends on the condition of the mule market and demand. Sometimes people breed right sharply and then again they fall off of it and there is no market, like there has been for the last twelve months."

On cross-examination, Mr. Hines further testified with reference to the market value of these jacks, as follows:

"In regard to these other jacks I talked about that I sold, one of those jacks went to Pecos, Tex. One was sold the fall before. I sold some jacks this last year after the Fair. I did state that I sold some jacks prior to the time these jacks died. I sold some along early in the fall; I couldn't say exactly what time. I can tell from my record. It was in the early fall when I sold them. Those jacks were at my farm when I sold them. I never sold any other jacks in Dallas during that Fair. * * * I said that those jacks were worth from seven to nine hundred dollars. I meant that they were worth that each."

[5] Evidently, as stated by counsel for the plaintiff in the oral argument, the jack sold to a party at Pecos, Tex., was one of this shipment. As stated by Mr. Hines, there may not be a fixed price for jacks like there is for cattle and hogs, yet if a witness shows that he is acquainted with the market value of high-bred cattle, horses, etc., and knows what the market value is, as between those who have them to sell and those who are in the market for such live stock, we think that he can testify therefrom as to the market value. As said in 3 Words and Phrases, p. 301, "market value" is such sum of money as the property is worth in the market generally to the persons who would pay the just and full value for what the property would bring

at a fair sale, where one party wants to sell and the other to buy. The market value of land is the price that in all probability would result from fair negotiation, where the seller is willing to sell and the buyer desires to buy the thing in question.

Complaint is also made of the failure of the court to submit to the jury the issue as to whether or not there was any market value at Dallas for the jacks of the kind and character in question, and that the submission of issue No. 6 was a charge on the weight of the evidence. Apparently no request was made for the submission of the issue as to whether there was any market value at Dallas for jacks of the kind and character in question, but the objection made to the submission of issue No. 6 was "for the reason that the court failed to submit the issue as to whether or not there was any market value at Dallas for the jacks of the kind and character in question, and special issue No. 6 thereby became a charge on the weight of the evidence." Appellant T. & P. Railway cites a number of cases in support of its contention, among them Fort Worth & Denver City Ry. Co. v. Harle, 240 S. W. 1004, by this court, and Wichita Valley Ry. Co. v. Turbeville, 269 S. W. 498, by Justice Dunklin of this court. In the latter case this court held that the issue of intrinsic value could not be submitted until it had been shown that there was no market value. In Fort Worth & Denver City Ry. Co. v. Harle, supra, by the writer hereof, this court said:

"The ground of attack on this charge is that it assumes that the cattle and horses in question had a market value at Malta, and the evidence in the case being in dispute and in conflict as to whether there was a market value for the cattle and horses at Malta, the court should not have assumed that there was a market value as a matter of law. Hardin testified that he did not know enough about the horses in this shipment to testify as to their reasonable market value, and did not know whether the kind and quality of such horses could have been sold in Malta or in that vicinity in the spring of 1917. The only other testimony as to the reasonable market value of the horses was that of R. H. Harle, plaintiff. Even were there no objection to his qualification as an expert witness upon the question of value (and this objection is very strenuous on the part of appellants), we think that the court should not have assumed that a market value of the horses had been established. Harle was an interested witness, and the jury were authorized under the law to disregard any part of his testimony, even though such testimony was reasonable and uncontradicted. Smith v. A. T. & S. F. Ry. Co. (Tex. Com. App.) 232 S. W. 290; Railway Co. v. Runnels, 92 Tex. 307, 47 S. W. 971; West Lumber Co. v. Goodrich (Tex. Com. App.) 223 S. W. 183, 192; Wichita Falls Traction Co. v. Berry (Tex. Civ. App.) 187 S. W. 415, 421; G. H. & S. A. Ry. Co. v. Murray (Tex. Civ. App.) 99 S. W. 144. We believe this assignment must be sustained, and the judgment reversed."

In that case only two witnesses testified as to the market value. One of them, Hardin, testified that he did not know enough about the horses in this shipment to testify as to their reasonable value and did not know whether the kind and quality of such horses could have been sold in Malta or in that vicinity in the spring of 1917. The plaintiff testified, over strenuous objection as to his qualification to do so, as to the market value. We held that under the circumstances shown it was error for the court to submit a charge which assumed that there was a market value for the horses in question. A writ of error was denied in the Harle Case.

[6] In the objection to this charge in the instant case there was no request made for the submission of an issue as to whether there was any market value at Dallas for jacks of the kind and character of the two which died. Nor is there any suggestion that the court should have submitted such issue. The only objection made is that the court assumed that there was a market value and thereby charged the jury on the weight of the evidence. A subsequent objection to this charge is that there was no evidence showing the existence of a market in Dallas for such jacks. There was evidence which we hold was sufficient to establish the market value of the jacks at Dallas. It is true that this evidence depends on the testimony of plaintiff Hines, who was an interested party, and if this objection had been properly presented and a request made for the submission of the issue as to the market value for such jacks at Dallas, we think the court should have submitted such issue. But we do not believe that objections to charges should be couched in veiled terms so as to hide rather than express the real objection thereto. Hart Bros. & Hamm v. Angus, 225 S. W. 813, by this court, opinion by Justice Dunklin; Isbell v. Lennox (Tex. Civ. App.) 224 S. W. 524, affirmed by Supreme Court, 295 S. W. 920. As said by Chief Justice Phillips of our Supreme Court in Walker v. Haley, 110 Tex. 50, 214 S. W. 295, the plain purpose of the statute "is to provide the court, in advance, with the objections to which the charge is deemed subject, so as to afford opportunity for its correction in the particulars urged. It is, in a word, to secure, as far as possible, the preparation and submission of a correct charge to the jury." Hence, we have concluded that no reversible error is shown by reason of the action of the trial court in not submitting this issue. We think that the record discloses a different state of facts from those in the Harle Case, supra, and the assignment should be overruled.

We have examined the other assignments carefully, and find no error therein. The judgment of the trial court is affirmed, in favor of the plaintiffs as against the defendant Santa Fé Railway, and in favor of the Santa Fé Railway over against the Texas & Pacific Railway.

## On Appellants' Motions for Rehearing.

Appellants Texas & Pacific Railway Company and Gulf, Colorado & Santa Fé Railway Company have both filed motions for rehearing, the latter company's motion being in the main formal. The Texas & Pacific Railway Company's motion insists that the trial court erred in failing to submit the issue as to whether there was a market value at Dallas for the jacks which died, and that such failure may be taken advantage of by appellant in the absence of a written request for such submission. That an objection to the issue submitted on the ground stated was sufficient to call the court's attention to the insufficiency, incompleteness, and error in the issues as submitted, and that no special request for the submission of the issue as to whether there was a market value in Dallas for the jacks in question, was necessary. It is urged that the Supreme Court laid down the rule in G., C. & S. F. Ry. Co. v. Conley, 113 Tex. 472, 260 S. W. 561, 32 A. L. R. 1183; Id. (Tex. Com. App.) 252 S. W. 737, that when a charge is improper or incomplete, it is not necessary for the party objecting to do more than to object to the manner and form in which the charge is submitted, and there is no duty on appellant's part to tender a charge or issue which will correct the defect or error in the charge given or proposed to be given by the court.

[7] The Conley Case, opinion by Chief Justice Cureton, involved the giving of a charge which the Supreme Court held was affirmatively erroneous. The Court of Civil Appeals had held that the charge was not affirmatively erroneous, and therefore not reversible error in the absence of a requested instruction by appellant more fully explaining the degree of care required by appellant as a carrier of passengers. The Supreme Court held that this was once the rule with reference to charges affirmatively erroneous; but due, however, to statutory enactments, it is no longer so. The court, after referring to article 2185 (then article 1971 [Rev. St. 1911]), which defines the duties of a judge as to the giving of a charge, and submitting it to the respective parties or their attorneys for inspection, and providing that "all objections not so made and presented shall be considered as waived," and article 2190 (then article 1985) providing for the submission of a case upon special issues, said:

"These two statutes were enacted to accomplish the same purpose, and we think a failure to submit any particular issue under either statute can be reviewed on appeal only where the record shows a special charge was tendered on that issue. But in the instance of a defective or erroneous charge on a subject or issue which the court has undertaken to charge upon, the objections required by article 1971 take the

place of special charges, and render it unnecessary that the latter be tendered. It is immaterial whether the matter objected to in the court's charge is a mere defective or incomplete statement of the law or issue to be determined or is affirmatively erroneous; objections which sufficiently specify the error will preserve the point on appeal, without the necessity of again directing the court's attention to the same subject by special charge.

"Had the Legislature intended that the complaining party should not only make objections, but tender a special charge as well, it undoubtedly would have said so. Having undertaken to state what must be done in this respect, the statute, under a well-known rule of construction must be held to have excluded the necessity of doing anything else. Other cogent reasons are given in the cases cited. Houston & Texas Central Ry. Co. v. Gant [Tex. Civ. App.] 175 S. W. 745; Hines v. Kelley [Tex. Com. App.] 252 S. W. 1033."

In the instant case the only objections which the Texas & Pacific Railway Company submitted on the submission of special issue No. 6, which inquired as to what was the reasonable cash value of the two jacks at the time of their death, were:

"26. This defendant excepts and objects to the submission of special issue No. 6 of the court's main charge to the jury, for the reason that the court fails to submit the issue as to whether or not there was any market value at Dallas for the jacks of the kind and character in question herein, and special issue No. 6 thereby becomes a charge on the weight of the evidence.

"27. This defendant excepts and objects to the submission of special issue No. 6 of the court's main charge to the jury, for the reason that there is no evidence showing that there is a market in Dallas, Tex., and that the testimony as given with reference thereto does not show that these jacks would have had the value as stated if placed on the market at that point.

. "28. This defendant excepts and objects to the submission of special issue No. 6 of the court's charge to the jury, for the reason that the undisputed testimony shows that the plaintiff who testified with reference to market value stated that he had not sold any jacks in Dallas, but that jacks sold by him had been sold at other places, and therefore there is insufficient evidence in this case to show that the jacks in question had any market value in Dallas at the place where the damage is alleged to have been incurred."

It will be noted that appellant does not object or except to the failure of the court to submit the issue as to whether there was any market value for said jacks in Dallas at the time of their death, but objects only to issue No. 6 as given, because, as charged, such issue, by reason of a failure to submit the issue as to whether there was any market value in Dallas for the jacks, becomes a charge on the weight of the evidence. The majority, at least, have concluded that objection No. 26, set out above, does raise the objection that the submission of issue No. 6, without the submission of the issue as to whether or not there was a market value for said jacks in Dallas at the time, was a charge on the weight of the evidence. Hines, who was the only witness that testified as to the market value, was the plaintiff, and the jury might have disregarded his testimony as to this matter altogether, as held in many cases, such as Ft. W. & D. C. Ry. Co. v. Harle, 240 S. W. 1004, by this court, and cases therein cited. The writer does not believe that the objection or exception to the issue as submitted is couched in such clear and unmistakable terms as such exceptions should be to a charge and that the form of the exception is calculated to mislead the trial court as to its purport. But the majority have concluded otherwise, and the motions for both appellants for rehearing are granted, and the judgment below is reversed and the cause is remanded.

[8, 9] The majority are of the opinion that the objection made in paragraph 26 was clearly an objection that the submission of issue No. 6 was a charge on the weight of the evidence, in that it assumed that jacks of the kind and character of those in question had a market value in Dallas at the time of their shipment, and the objection clearly suggested to the court that an issue should be submitted as to whether there was a market value for said jacks at Dallas at the time of the shipment, that being the only issue of value alleged in the petition. Plaintiffs sued to recover the market value of the jacks, and the burden was on them to show market value. It was not incumbent on defendants to assist plaintiffs in making out their case. For the reasons stated, the majority are of the opinion that the authorities noted above have no proper application.